UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:09-CR-163 |
| | ) | (PHILLIPS/GUYTON) |
| MORRIS E. NANCE, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the District Court

as may be appropriate.  This case is now before the Court on the Defendant's Motion to Suppress

Evidence [Doc. 21] filed on February 11, 2010.  The parties appeared before the undersigned for a

hearing on the Defendant's Motion on July 23, 2010.  Assistant United States Attorney Alexandra

Hui was present on behalf of the Government.  Attorney Karmen Waters was present on behalf of

the Defendant, who was also present.  At the conclusion of testimony, the parties asked to file post-

hearing briefs.  The post-hearing briefs were filed on August 20, 2010.  The Court took the

arguments, evidence, and filings under advisement on that date.

## I.  FACTS

Based on the testimony and evidence presented at the suppression hearing on July 23, 2010,

the Court makes the following findings of fact.[1]  On October 2, 2009, Tennessee Highway Patrol ("THP") Trooper Joseph Walker was patrolling the northern half of THP's "Knoxville District," which encompasses Anderson County, Campbell County, and Scott County.  [Tr. 6, 7].  Walker was working the "midnight shift" which began at 11:00 p.m. on October 1 and ended at 7:00 a.m. on October 2.  [Tr. 6].  At some time between 12:30 a.m. and 1:30 a.m., Walker heard a "be on the lookout" ("BOLO") report broadcast by a police radio dispatcher.[2]  [Tr. 8].  Walker testified that the BOLO report stated that there had been an armed robbery at a McDonald's located near the "East Towne Mall" in Knox County.[3]  [Tr. 8].  He further testified that the BOLO report stated that shots were fired during the robbery.  [Tr. 8].  Walker heard the BOLO report description of the robbery suspects to be as follows: "Two black males in a dark-colored Oldsmobile or Buick.  They were wearing dark-colored clothing and hoodies or sweatshirts."  [Tr. 8].  Walker also heard additional BOLO reports regarding the McDonald's robbery from other law enforcement agencies.  [Tr. 23-26].  At least one of these reports described a third suspect as a "white male" and stated that the suspects

---

[1] The Court notes that much of the factual background that is alleged in the parties' memoranda was not established by the testimony and exhibits presented at the hearing.  Specifically, the Court notes that the parties failed to establish (1) the circumstances of the alleged string of three armed robberies that occurred during the early morning hours of October 2, 2009, and (2) the actual content of the BOLO reports broadcast by police radio dispatchers in response to each of the robberies.  The findings of fact set out here in part I are limited to what was proved at the suppression hearing.  Factual allegations contained in the parties' memoranda that were not proved at the hearing are given no consideration in the Court's analysis.

[2] Walker was unable to recall the source of the first dispatch broadcast he heard.  [Tr. 24]. He testified that he was listening to the THP radio dispatcher and the radio dispatchers of other law enforcement agencies.  [Tr. 23].  Walker stated that he typically monitors as many as ten different police dispatch frequencies while on patrol.  [Tr. 24, 50]. He explained that, "Sometimes when information starts being given out over crimes that go on and everybody starts repeating it, it's hard to determine which one actually says what information."  [Tr. 24].

[3]Although still often referred to as "East Towne Mall," the name changed from "East Towne Mall" to "Knoxville Center" in 1997.

may be wearing "white clothing." [Tr. 24-25].

Approximately one hour later, at some time between 1:30 a.m. and 2:30 a.m., Walker heard another BOLO report.[4] [Tr. 8]. This second report stated that there had been a carjacking at an ATM machine. [Tr. 8-9]. Walker testified how he heard the BOLO report description of the carjacking suspects: "The suspect information was the same as [it was for] the McDonald's [robbery] and also included the dark-colored Oldsmobile or Buick and then another vehicle that was a white-colored car." [Tr. 8-9].

Approximately one hour after hearing the second BOLO report, at some time between 2:30 a.m. and 3:30 a.m., Walker was patrolling Clinton Highway in Clinton, Tennessee, when he heard a third BOLO report.[5] [Tr. 9]. This third BOLO report stated that an armed robbery had occurred at a Walgreen's Pharmacy located at the intersection of Clinton Highway and Merchants Road outside of Knoxville. [Tr. 9]. Walker testified about the BOLO report description of the robbery suspects as follows: "They give out the suspect information over the radio which matched the other two suspects at the two previous armed robberies."[6] [Tr. 9]. Walker testified that he could not

---

[4] Walker was unable to recall the source of the second BOLO report. <u>See</u> [Tr. 24-26].

[5] Again, Walker was unable to recall the source of the BOLO report. [Tr. 24-26]. Walker testified that after hearing the third BOLO report, he focused on radio broadcasts from the Knox County Sheriff's Office dispatcher. [Tr. 26] ("After the last one, I was listening to the county radio more than mine . . .").

[6] The Court notes that Walker's testimony was somewhat inconsistent regarding the specifics of the BOLO report following the armed robbery of the Walgreen's. As stated above, Walker first testified that, "They give out the suspect information over the radio which matched the other two suspects at the two previous armed robberies." [Tr. 19]. But on cross examination, Walker's testimony was as follows:

remember if any vehicle was described in the BOLO report in connection with the Walgreen's robbery. [Tr. 28 ("I don't remember whether the vehicle information was given out or not. There was information saying that this could possibly be the same subjects that had committed the prior two armed robberies. That information, I believe, had gone over the radio.")].

At this point Walker was monitoring several law enforcement frequencies that were repeating different versions of all three BOLO reports. [Tr. 30 ("I don't remember specifically what information come over which radio frequency")]; see n.2, *supra*. Walker testified that, despite the variation, all of the law enforcement broadcasts provided the same core information:

> The basic information that I picked up on was there was a dark-colored vehicle, possibly an Oldsmobile or Buick. After the second armed robbery there was a white vehicle involved. And that there was possibly two suspects, maybe more: two black males and maybe also a white male. That was the basic information that I honed in on . . . that's what I was looking for, a dark-colored Buick or Oldsmobile and possibly a white vehicle[.]

[Tr. 26]; see also [Tr. 30-31].

After hearing the third BOLO report, Walker drove south on Clinton Highway toward the Walgreen's to "see if [he] could possibly pass or locate the vehicle that was given in the information" provided by the three BOLO reports.[7] [Tr. 9]. After reaching the intersection of

---

MS. WATERS:     You also learned that they didn't have any suspect information from the Walgreen's other than a black male and white clothing?

WALKER:     That's correct.

[Tr. 27].

[7] Walker explained why he drove southbound on Clinton Highway as follows: "Because the last armed robbery was conducted at the intersection of Clinton Highway and Merchants Road. I thought possibly that the suspects might come up Clinton Highway, being that there was other drug stores and other shops and stores and businesses in the area that could also be robbed." [Tr. 10].

Clinton Highway and Merchants Road, Walker "turned around and started back north on Clinton Highway." [Tr. 10]. While traveling northbound on Clinton Highway at shortly before 4:00 a.m., Walker spotted two vehicles stopped ahead of him in the northbound thru lanes.[8] [Tr. 10 ("I noticed two vehicles that were parked in the middle of the road in the northbound lanes.")]. One vehicle was a maroon Buick driven by the Defendant. The other vehicle was a "white Ford or Mercury product" that "looked similar to a patrol car" and had "dark tinted windows and chrome wheels." [Tr. 10]. Walker testified that the maroon Buick driven by the Defendant "matched the description given of the three armed robbery suspects' vehicle." [Tr. 10-11]. Walker also testified that his suspicion was aroused by the fact that the two vehicles were stopped in the middle of the highway: "Being that there was no traffic going north or south and there was no red light where they were parked at, it was just odd to find two vehicles parked in the middle of the road at that time of morning." [Tr. 11].

Walker watched as the white vehicle began to drive forward in the left thru lane and then pulled into the right thru lane in front of the Buick. The Buick then drove forward and followed the white vehicle northbound in the right thru lane. [Tr. 11]. Walker pursued the two vehicles northbound on Clinton Highway. After a short distance, the white vehicle turned from the right northbound thru lane into the parking lot of a Conoco/Pilot service station located at the intersection of Clinton Highway and Callahan Road. [Tr. 11]. The Buick continued northbound on Clinton Highway. [Tr. 11]. Walker followed the Buick northbound "for a mile or a mile and a half." [Tr. 11]. The Buick then moved from the right thru lane into the left thru lane. [Tr. 11]. Walker described what happened next:

_____

[8] Clinton Highway is a four-lane divided highway with two northbound thru lanes and two southbound thru lanes. At various points along the highway (usually at intersections), there are additional turn lanes.

-5-

[The vehicle] attempted to stop and make a left-hand turn and then pulled back out into the left-hand lane continuing north and then pulled up to another intersection, started to make a left-hand turn and then pulled back out and continued north again on Clinton Highway.

[Tr. 11-12]; <u>see also</u> [Tr. 35].

Walker found this driving pattern suspicious, and he believed that Defendant was attempting to learn whether he was being followed.[9]  Walker decided to conduct an investigatory stop of the Buick and he activated the blue emergency lights on his cruiser.  [Tr. 12]; [Exhibit 1].  The Defendant quickly pulled off of Clinton Highway and stopped at 3:54 a.m. in the parking lot of a gas station located at the corner of Emory Road.  [Tr. 12, 19]; [Exhibit 1 (cruiser video shows the Buick come to a stop next to a gas pump in the Weigel's parking lot at 3:54:16 a.m.)].

Walker approached the Buick with his service pistol drawn and held behind his back out of sight of the Defendant.  [Tr. 13, 20, 35-36]; [Exhibit 1].  Walker asked the Defendant to exit the vehicle and place his hands on the trunk.  [Exhibit 1].  The Defendant got out of the Buick, left the driver door open, and walked to the trunk.  [Exhibit 1]; [Tr. 23].  Walker patted the Defendant's outer clothing to check for weapons.  [Tr. 15, 20]; [Exhibit 1].  After determining that the Defendant was unarmed, Walker asked to see the Defendant's identification.  [Exhibit 1].  Walker next asked the Defendant, "Where you going?"  [Exhibit 1 at 3:56:07 a.m.].  The Defendant replied, "I'm going to my auntie's house."  [Exhibit 1 at 3:56:09 a.m.].  Walker testified that the Defendant was unable to provide the address or the name of the street where his aunt purportedly lived.  [Tr. 21, 40].

_____

[9] Walker described his suspicions: "It just appeared that [the driver of the Buick, the Defendant,] was either trying to see if I was following him because he was a suspect that had committed the armed robberies and he wanted to make sure that I was actually following him, or he was looking to maybe try and get away from me, being that he could be the suspect that had committed the armed robberies."  [Tr. 12].

Walker returned to his cruiser to call for backup. [Tr. 16, 22, 36]; [Exhibit 1]. At 3:56:39 a.m., he stated to his dispatcher, "I've got a black male with a dark-colored hood and a maroon Buick." [Exhibit 1]. The Defendant was wearing "a dark sweatshirt or hooded sweatshirt" at the time of the stop. [Tr. 15, 32-33]; [Exhibit 1].

While waiting for backup to arrive, Walker asked the Defendant a series of general questions. [Exhibit 1]; [Tr. 15] (Walker stated that he engaged the Defendant "in general conversation"). First, Walker asked, "Who's car is this?" [Exhibit 1 at 3:57:40 a.m.]. Second, he asked "Who were you talking to in the white car parked in the middle of Clinton Highway?" [Exhibit 1 at 3:57:46 a.m.]. Third, Walker asked, in reference to the driver of the white vehicle, "What's his name?" [Exhibit 1 at 3:57:58 a.m.]. Walker followed this up with, "Where was he going?" [Exhibit 1 at 3:58:05 a.m.]. Fifth, Walker asked, "Who's phone is in the car?" [Exhibit 1 at 3:58:07 a.m.]. Sixth, he asked, "Where all you been tonight?" [Exhibit 1 at 3:58:27 a.m.]. When the Defendant responded that he had been on the "east side," Walker asked, "Where's the east side?" [Exhibit 1 at 3:58:31]. Finally, Walker asked, "Where else you been?" [Exhibit 1 at 3:58:43].

Walker testified that the Defendant appeared "very nervous" and "at different points in time during the conversation actually stuttered and was unsure of his answers when giving answers to the questions that I asked him." [Tr. 16]; see also [Tr. 44, 46]. At the conclusion of Walker's questioning, the Defendant asked if he could leave. [Exhibit 1 at 3:59:03 a.m.]. Walker replied, "No. You move off that car and you are going to have a bad day." [Exhibit 1 at 3:59:05 a.m.].

During Walker's brief interrogation of the Defendant, officers from the Knoxville Police Department ("KPD") arrived at the scene. [Tr. 16, 22-23]; [Exhibit 1 (cruiser video shows that additional law enforcement officers were on scene at 3:58:40 a.m.)]. At 3:59:53 a.m., one of these

officers conducted a second pat down of the Defendant's outer clothing. [Exhibit 1]. At 4:00:25 a.m., a second KPD officer began speaking with the Defendant. [Exhibit 1]. This officer conducted a third pat down of the Defendant's clothing and reached his hands into the Defendant's pants pockets. [Exhibit 1]. Another KPD officer assisted by lifting up the layers of the Defendant's upper clothing. [Exhibit 1 at 4:00:48 a.m. to 4:00:54 a.m.].

At 4:01:18 a.m., the Defendant was handcuffed. [Exhibit 1]. At 4:01:26 a.m., a KPD officer opened the front passenger door of the Buick. [Exhibit 1]. A female KPD officer kneeled in the open doorway and put her head and shoulders inside the vehicle. [Exhibit 1 at 4:01:34 a.m. to 4:01:38 a.m.]. All of the police officers on scene then walked away from the Buick.

At approximately 4:04:20 a.m., Deputy Jason Myers, a K-9 unit officer with the KPD, and his narcotics detector dog, Axel, began a drug detection sniff of the Buick. [Exhibit 1]; [Tr. 60-61, 65]. During the sniff, Axel jumped through the open driver door into the passenger compartment.[10] [Exhibit 1 at 4:04:27 a.m. through 4:04:40 a.m.]; [Tr. 62]. At some point while inside the passenger compartment, Axel alerted to the presence of the odor of narcotics by scratching at the "center console" between the driver seat and the front passenger seat. [Tr. 62, 125-26]. Meyers described Axel's alert as follows: "He showed obvious signs of being in odor which he was smelling quickly in the area and then he did a scratch on [the center console] with his paw. The scratch was a final response." [Tr. 127].

After Axel's alert, Meyers "pulled him out of the vehicle and continued" directing the sniff. [Tr. 62-63]. When Myers and Axel reached the passenger side of the vehicle, Axel jumped through the open front passenger door into the passenger compartment. [Exhibit 1 at 4:05:07 a.m. through

---

[10] Meyers testified that "both the driver and passenger side doors were already open" when he arrived at the scene. [Tr. 61]; see also [Tr. 65].

4:05:19 a.m.]; [Tr. 63]. The drug detection sniff concluded at approximately 4:05:29 a.m. [Exhibit 1]; [Tr. 67, 131].

After the drug detection sniff, KPD officers searched the Buick. [Tr. 63]. Walker was present during the search but did not participate. [Tr. 17, 32]. A .22 rifle was discovered "under [the] passenger seat in the back floorboard." [Tr. 17-18]. Latex gloves were found "in the front passenger area of the vehicle," and some clothing was found in the trunk. No illegal drugs were found inside the vehicle. [Tr. 63].

## II.   POSITIONS OF THE PARTIES

The Defendant's motion seeks the suppression of "any and all evidence seized as a result of a search of the vehicle driven by the Defendant on October 2, 2009, and the search of two additional vehicles located at 1605 Wallace Street, Knoxville, Tennessee, on that same day." [Doc. 21 at 1]. The Defendant contends that the seized evidence must be suppressed because the police violated his Fourth Amendment rights in several ways. See [Doc. 22 at 6 ("This stop is illegal. The search of the red Buick is illegal. The search of the two cars located at Defendant's residence is illegal.")]. First, the Defendant contends that it was unlawful for Walker to initiate an investigatory stop of the Buick he was driving on October 2, 2009. The Defendant argues that the stop "must be ruled a violation of the Fourth Amendment" because "[t]here is no allegation that the Defendant violated any traffic law," [Doc. 22 at 3], and "the officer did not have a reasonable suspicion that the car was involved in anything illegal," [Doc. 22 at 2].[11]

_____

[11] The Defendant appears to abandon this argument in his post-hearing brief [Doc. 52]. The Defendant states that "[s]eeing him stopped in the road talking to someone in a white car . . . only gave the officer a basis to stop the car for an investigative inquiry." [Doc. 52 at 3]. The Defendant further states that "[t]he trooper's observation of the white car along with the bulletins

Next, the Defendant contends that it was unlawful for police to search the Buick after it was stopped. The Defendant argues that police had neither his consent nor probable cause to justify searching the vehicle. [Doc. 22 at 4]; [Doc. 52 at 1 ("there was not probable cause . . . to search the vehicle")]; [Doc. 52 at 7-11]. The Defendant specifically argues that the canine drug detection sniff that was performed on the vehicle did not provide police with probable cause because (1) the sniff was not executed properly, and (2) the K-9 that performed the sniff, Axel, was not reliable. See [Doc. 22 at 4]; [Doc. 52 at 9 ("The dog did not alert.")]; [Doc. 52 at 14] ("The dog did not sniff the exterior [of the car] as permissible under the Fourth Amendment, instead he entered or searched the car."); [Doc. 52 at 10 ("Based on the expert testimony of Steven D. Nicely, the Defendant submits that the canine utilized in this case is neither properly trained nor reliable under the facts and circumstances of this case.")].

Third, the Defendant contends that "[t]he officers did not have probable cause to arrest [him]." [Doc. 52 at 1]; [Doc. 52 at 3 ("Seeing the Defendant stopped in the road talking to someone in a white car, coupled with the information relayed in the broadcasts . . . does not make probable cause.")].

Finally, the Defendant contends that the evidence discovered during the search of two vehicles located at 1605 Wallace Street should be suppressed because it is "fruit of the poisonous

---

did not provide probable cause that [the Defendant] committed a robbery, it simply provided the basis to make the investigative stop to investigate to link him to the robbery." [Doc. 52 at 3; see also [Doc. 52 at 6] ("[T]he totality of the information known to the officers was sufficient to stop and question Mr. Nance to determine whether he was the person who committed the robbery."). These statements indicate that the Defendant concedes that the investigatory stop in this case was lawful. Nevertheless, the Defendant's post-hearing brief expressly states that it "incorporates the arguments and case law contained in" the Motion to Suppress Evidence [Doc. 21] and Memorandum in Support [Doc. 22] "as if the same were specifically set forth herein." [Doc. 52 at 1]. Accordingly, the Court will address the lawfulness of the investigatory stop.

tree." [Doc. 22 at 5]. The Defendant argues that "[t]he police would not have gotten to those vehicles except through the illegal stop" of the Buick driven by the Defendant. [Doc. 22 at 5]. The Defendant explains as follows:

> [The] cases make it clear that anything derived from the illegal stop or search must also be suppressed. This is exactly what we have in the present case. The illegal stop produced the address of the Defendant. The officers did not know of him, or his name or address, until he was stopped. This illegally obtained information led to the locations of the other cars which yielded evidence against the Defendant. This is classic "fruit of the poisonous tree," and the evidence seized from these two vehicles at the Defendant's residence must be suppressed.

[Doc. 22 at 5-6]; see also [Doc. 52 at 6 (alleging that the address, 1605 Wallace Street, was learned by police only *after* the Defendant was arrested)].

In response, the Government contends that the initial investigatory stop of the Buick was lawful. [Doc. 53 at 4]. The Government argues that Walker had a reasonable suspicion that the Buick was involved in a series of three armed robberies. The Government asserts that six facts provided Walker with reasonable suspicion: (1) the Buick matched the description of a vehicle involved in the robberies that was provided in police radio BOLO reports; (2) the Buick was spotted on a highway "in the general vicinity" of the third robbery; (3) the Buick was first seen by Walker as it was stopped next to another vehicle in the thru lanes of a highway; (4) the other vehicle matched the color description of a vehicle involved in at least one of the robberies that was provided in police radio BOLO reports; (5) there were very few cars on the highway at the "very early morning hour" when Walker observed the two stopped vehicles; and (6) the Defendant made some unusual driving maneuvers once Walker began to follow him. [Doc. 26 at 5-6]; see also [Doc. 53 at 5].

The Government next contends that the search of the Buick after it was stopped was lawful

because police "had probable cause to believe that the car contained the fruits of a crime." [Doc. 26 at 5]. The Government argues that there were two bases for probable cause. First, the Government asserts that the same six facts that purportedly gave Walker reasonable suspicion to justify an investigatory stop combined with two additional facts to provide police with probable cause to believe that "particular evidence from the string of robberies" was inside the Buick. [Doc. 26 at 5-6]; see also [Doc. 53 at 4 (stating that the search can be justified "as a search supported by probable cause that evidence of a crime would be found")]; [Doc. 53 at 8 (listing the facts that purportedly gave police probable cause)]. The two additional facts were that (1) "the Defendant himself met the general description of the suspects reported in the police bulletins, namely, he was a young black male" and "was wearing clothing matching that of the robbers," and (2) "the Defendant acted nervously and gave an incredible story to the officer when asked where he was going." [Doc. 53 at 8].[12]

Second, the Government asserts that the drug detection sniff that was performed on the Buick provided police with probable cause to believe that illegal narcotics were inside. [Doc. 53 at 4]. The Government concludes that because police had probable cause, their warrantless search of the vehicle was "fully justified" under the automobile exception to the warrant requirement. [Doc. 26 at 5].

As an alternative justification for the search of the Buick, the Government argues that the police had "reasonable suspicion that weapons were within the passenger compartment." [Doc. 53 at 4]. The Government asserts that Michigan v. Long, 463 U.S. 1032, 1049-51 (1983), permits a

_____

[12] The Government argues that the same facts that provided police with probable cause to believe that the Buick contained evidence of the robberies also provided police with "probable cause to arrest the Defendant for the reported robberies." [Doc. 53 at 8].

police officer to search the passenger compartment of a vehicle for weapons when he has reasonable suspicion that an occupant of the vehicle "'is dangerous and might access the vehicle to gain immediate control of weapons.'"  [Doc. 53 at 16] (quoting Arizona v. Gant, 556 U.S. __, 129 S. Ct. 1710, 1721 (2009)).

Finally, the Government contends that the evidence discovered during the search of two vehicles located at 1605 Wallace Street should not be suppressed as "fruit of the poisonous tree." The Government argues that because the search of the vehicle driven by the Defendant was lawful, "the evidence derivatively obtained therefrom," [Doc. 26 at 7], "is not subject to the exclusionary rule," [Doc. 26 at 6].  The Government concludes that "the fruits of the poisonous tree doctrine is inapplicable here."  [Doc. 26 at 7]; see also [Doc. 53 at 17].

## III.    ANALYSIS

As set out above, the Defendant contends that the rights guaranteed to him by the Fourth Amendment were violated in several ways.  "The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible."  United States v. Dice, 200 F.3d 978, 983 (6th Cir. 2000); Mapp v. Ohio, 367 U.S. 643, 654 (1961) ("all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court"); Weeks v. United States, 232 U.S. 383, 398-99 (1914) (establishing the exclusionary rule as the remedy for violations of the Fourth Amendment).  The Court considers the Defendant's contentions in turn.

### A.    Investigatory stop

The Defendant contends that it was unlawful for Walker to initiate an investigatory stop of

the Buick he was driving on October 2, 2009. The Defendant argues that the stop "must be ruled a violation of the Fourth Amendment" because "[t]here is no allegation that the Defendant violated any traffic law," [Doc. 22 at 3], and "the officer did not have a reasonable suspicion that the car was involved in anything illegal," [Doc. 22 at 2]. The Court disagrees.

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend. IV. A "seizure" of a person within the meaning of the Fourth Amendment occurs when a police officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 20 n.16 (1968).

The law is settled that in Fourth Amendment terms the investigatory stop of an automobile "entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'" Brendlin v. California, 551 U.S. 249, 255 (2007) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)); see also Arizona v. Johnson, 555 U.S. __, 129 S. Ct. 781, 783 (2009) ("a traffic stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will" (citation omitted)); Whren, 517 U.S. at 809-10 ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period of time and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of the [Fourth Amendment].")); Colorado v. Bannister, 449 U.S. 1, 4 n.3 (1980) ("There can be no question that the stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the meaning of the Fourth Amendment."); United States v. Arvizu, 534 U.S. 266, 273 (2002).

In this case, it is clear that the Defendant was seized within the meaning of the Fourth Amendment "from the moment [the Buick] came to a halt." Brendlin v. California, 551 U.S. 249, 255 (2007) (observing that an investigatory stop of a vehicle involves a seizure of a driver). The

-14-

Defendant remained seized at the scene of the stop until he was arrested. See [Exhibit 1 at 3:59:03 a.m. through 3:59:05 a.m. (In response to the Defendant's asking if he could leave, Walker replied, "No. You move off that car and you are going to have a bad day.")]. The question for the Court's resolution is whether the seizure of the Defendant was unreasonable.[13]

The seizure of a person that is effected by an investigatory vehicle stop comports with the Fourth Amendment only if police have reasonable suspicion that criminal activity may be afoot. United States v. Hurst, 228 F.3d 751, 757 (6th Cir. 2000) (holding that the Terry doctrine applies to investigative stops of moving automobiles.") see also Terry, 392 U.S. at 21 (holding that investigatory stop is reasonable if the officer making the stop is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion."). In United States v. Cortez, 449 U.S. 411, 417-18 (1981) (internal citations omitted), the Supreme Court explained when a police officer has reasonable suspicion sufficient to justify an investigatory stop:

> An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. . . . [T]he totality of the circumstances–the whole picture–must be taken into account. Based upon that whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.
>
> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of

---

[13] The Defendant does not challenge the reasonableness of the length of his detention at the scene of the traffic stop prior to his arrest. See [Tr. 48] (defense counsel acknowledges that the length of the stop is not an issue). Accordingly, the Court considers only whether Walker's initial stop of the Defendant was reasonable.

operation of certain kinds of lawbreakers.  From these data, a trained officer draws inferences and makes deductions–inferences and deductions that might well elude an untrained person. . .

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

449 U.S. 411, 417-18 (1981) (internal citations omitted).

In United States v. Hensley, the Supreme Court clarified that a police officer is also permitted to make an investigatory stop when he has "a reasonable suspicion, grounded in specific and articulable facts, that a person [he] encounter[s] was involved in or is wanted in connection with a completed felony."  469 U.S. 221, 229 (1985).  Thus, it is now well-settled that an investigatory stop of a vehicle is lawful when the police officer making the stop has a reasonable suspicion that the vehicle (and/or its occupants) "'has been, is, or is about to be engaged in criminal activity.'" Hensley, 469 U.S. at 227 (quoting United States v. Place, 462 U.S. 696, 702 (1983)); see also United States v. Jacob, 377 F.3d 573, 577 (6th Cir. 2004) United States v. Barrett, 890 F.2d 855, 860 (6th Cir. 1989).

A police officer may develop reasonable suspicion based on information he learns from police bulletins, flyers, dispatches, or BOLO reports.  Hensley, 469 U.S. at 232  (holding that detaining a person after  reliance on police bulletin based on articulable facts supporting a reasonable suspicion is justified); United States v. Erwin, 155 F.3d 818, 822 (6th Cir. 1998) ("A law enforcement officer is generally justified in stopping an individual and asking for identification when relying on information transmitted by a valid police bulletin.").  A police officer has reasonable suspicion to justify an investigatory stop of a vehicle when (1) he observes that the vehicle (and/or its occupants) matches a sufficiently detailed description provided in a BOLO report,

and (2) this observation is made at a place and time that is not inconsistent with any information provided in the BOLO report.  See United States v. Babb, 77 F. App'x 761, 763 (6th Cir. 2003) (holding that a state trooper had reasonable suspicion to stop a vehicle because the vehicle and its driver matched a description in a BOLO report that was detailed enough to "create[] a sufficiently narrow class of suspects"); Hurst, 228 F.3d at 757 (holding that a police officer had reasonable suspicion to stop a vehicle because it matched the "distinctive description" provided in a police dispatch regarding a burglary and it was observed "at a location consistent with the time needed to travel to that point from" the location of the burglary); see also United States v. Avery, 2010 WL 419946, at *3 (W.D. Tenn. Jan. 28, 2010) (holding that "[o]fficers clearly had reasonable suspicion sufficient to justify an investigative stop" of a van because it "matched [a] BOLO description in every detail" and it was "spotted cruising in the same area where" the robbery that prompted the BOLO report had occurred); United States v. Holmes, 2009 WL 1076299, at *6 (E.D. Tenn. Apr. 21, 2009) (finding that the facts that an automobile fit "the unique description" provided in a BOLO report and was spotted in close "proximity to the scene of two different criminal acts" that prompted the BOLO report "weigh[] in favor of reasonable suspicion").

A BOLO report may be relied upon in the formation of reasonable suspicion when it provides a description of a suspect or suspect vehicle that is "distinctive," Hurst, 228 F.3d at 757, enough to "create[] a sufficiently narrow class of suspects," Babb, 77 F. App'x at 763.  In United States v. Babb, the Court of Appeals for the Sixth Circuit explained as follows:

> [F]acts like common license plates or the race of the driver are characteristics too vague to support a stop because there are too many persons who fit the description.  However, we must view the description as a whole to determine whether it describes a sufficiently narrow class of vehicles. . . . Totally innocent facts taken together significantly narrow the suspect group.

77 F. App'x at 766-67 (citations omitted).  An investigatory stop may be reasonable even if the vehicle does not perfectly match the description provided in a BOLO report.  In <u>Hurst</u>, a police officer was instructed by his dispatcher to be on the lookout for "a dark-colored [Ford] Thunderbird," 228 F.3d at 755, with a missing front grille, <u>id.</u> at 757, "containing two persons," <u>id.</u> at 756.  Based on this description, the officer stopped "a dark blue Mercury Cougar" with a missing front grille and three occupants.  <u>Id.</u> at 755.  The court held that the stop was reasonable despite the discrepancy between the stopped vehicle's appearance and the dispatcher's description.  <u>Id.</u> at 757.  The court explained that the stopped vehicle "roughly match[ed]" the "color and style" described by the dispatcher, and it concluded that "[t]he presence of three persons in the car, rather than two, is a discrepancy that might reasonably be explained in any number of ways and does not defeat the assessment that [the officer] had reasonable grounds to investigate further."  <u>Id.</u>

In <u>Babb</u>, a state trooper received a BOLO report for a "late model sliver or grey Oldsmobile Alero with a blue/white Michigan plate" with a black female driver and a black male passenger.  <u>Id.</u> at 763 n.2.  The BOLO report also stated that the suspects were believed to be en route back to the Detroit area from Grand Rapids, possibly on I-94 or I-96.  <u>Id.</u>  Based on the BOLO report, the trooper stopped "a newer Oldsmobile Alero driven by a black man riding alone" on eastbound I-96 toward Detroit.  <u>Id.</u> at 763.  Relying on <u>Hurst</u>, the Court of Appeals found that "the discrepancy between the number of passengers in the BOLO and the number of passengers in [the defendant]'s Alero does not defeat the assessment of reasonable suspicion."  <u>Id.</u> at 766.  The court concluded that the stop was reasonable because "[t]he totality of the circumstances shows that the car matched in make, model, and color; that [the defendant] matched the physical description of the robber; and the car was traveling the route expected in the BOLO."  <u>Id.</u>

Turning to this case, the Court finds, based on the totality of the circumstances, that Walker

had a reasonable suspicion that the Buick driven by the Defendant had been involved in the armed robberies.  Walker heard multiple BOLO reports relating to a series of three armed robberies.  From these reports, Walker distilled that he should be on the lookout for two black males and possibly a white male traveling in a dark-colored Oldsmobile or Buick and a white vehicle.  See [Tr. 8-9, 26, 30-31].  Very soon after hearing the BOLO reports regarding the third robbery, Walker spotted a maroon Buick driven by a black male stopped in the middle of the highway next to a white vehicle.  [Tr. 10].  At the time he spotted the Buick, he was driving on Clinton Highway in the vicinity of the Walgreen's Pharmacy where the third robbery occurred.  [Tr. 9]; see n.6, supra.  It was nearly 4:00 a.m., and there was very little traffic on Clinton Highway.  See [Exhibit 1]; [Tr. 11].  Walker followed the Buick and observed it making some unusual maneuvers.  [Tr. 11-12, 35].  Walker reasonably interpreted these maneuvers as an attempt by the Defendant to elude or to learn if he was being followed.  See n.9, supra.

Based on these facts, Walker's suspicion of the Buick was reasonable and sufficient to justify an investigatory stop.  The description provided in the BOLO reports–two black males and possibly a white male traveling in a dark-colored Oldsmobile or Buick and a white vehicle–created a sufficiently narrow class of suspects at shortly before 4:00 a.m.  The maroon Buick driven by the Defendant  "roughly match[ed]" the "color and style" described in the BOLO reports, Hurst, 228 F.3d at 757, and it was traveling with a white vehicle.  Further, as was the case in Hurst, Babb, Avery, and Holmes, the Buick was encountered at a location that was consistent with, and to be expected from, the information provided in BOLO reports.  When a vehicle matches the description provided in BOLO reports and it is observed in a location consistent with those reports, "[t]hese two facts combine to give officers more than enough suspicion to warrant a temporary detention of the vehicle and its occupants to allow for further investigation."  Avery, 2010 WL 419946, at *3.

Walker also relied upon the Buick's driving pattern to form a reasonable suspicion. The Court finds that it was reasonable for Walker to be suspicious of the fact that the Buick was stopped next to another vehicle in the thru lanes of a divided highway. See n.8, *supra*. The Court further finds that it was also reasonable for Walker to be suspicious of the Defendant's unusual driving maneuvers. United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975) (finding that the "[t]he driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion."); See n.9, *supra*. In sum, the totality of the circumstances gave Walker a reasonable suspicion sufficient to justify initiating an investigatory stop of the Buick. Accordingly, the Court concludes that the seizure of the Defendant did not violate the Fourth Amendment.

### B. Arrest

The Defendant contends that "[t]he officers did not have probable cause to arrest [him]." [Doc. 52 at 1]; [Doc. 52 at 3 ("Seeing the Defendant stopped in the road talking to someone in a white car, coupled with the information relayed in the broadcasts . . . does not make probable cause.")]. The Government responds the Defendant's arrest was supported by probable cause based on the matching description of "the suspects combined with the police bulletin." [Doc. 52 at 5].

In the absence of probable cause, an arrest constitutes an unreasonable seizure in violation of the Fourth Amendment. Ingram v. City of Columbus, 185 F.3d 579, 592-93 (6th Cir. 1999). "[P]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the

circumstances." <u>Maryland v. Pringle</u>, 540 U.S. 366, 371 (2003). However, the common substance of all the definitions of probable cause is a "reasonable ground for belief of guilt" that is particularized with respect to the person to be searched or seized." <u>Id.</u>

In order to determine whether an arrest was supported by probable cause, the "facts and circumstances within [the arresting officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent" person to determine whether that individual had committed or was continuing to commit an offense. <u>Beck v. Ohio</u>, 379 U.S. 89, 91(1964). The Sixth Circuit found that "this inquiry requires a court to examine the events leading up to the arrest and then to decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" <u>United States v. Torres-Ramos</u>, 536 F.3d 542, 555 (6th Cir. 2008) (quoting <u>Pringle</u>, 540 U.S. at 371 (2003)). Courts apply a "totality of the circumstances test for probable cause and examine the evidence with respect to each person seized." <u>Id.</u> Officers must "show more than a mere suspicion . . . [but the probable cause standard] does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence to establish guilt beyond a reasonable doubt." <u>United States v. Strickland</u>, 144 F.3d 412, 416 (6th Cir. 1998).

In the present case, Officer Walker had circumstantial evidence that the automobile in which he found the Defendant was tied to the three armed robberies based on the BOLO reports. Officer Walker observed that the automobile matched the BOLO reports general description, the Defendant matched the general description of the suspect identified in the BOLO reports, that the Defendant was in the vicinity of the last robbery, that the Defendant's maroon car was stopped in the middle of Clinton Highway next to a white car matching the general description of the car identified in the second armed robbery, and the Buick was observed close proximity to

the time Officer Walker heard the last BOLO. Further, Officer Walker noted that the Defendant was nervous and evasive when answering questions about his activities earlier in the evening and about where he was traveling at the early morning hour. The Defendant said he was on his way to his aunt's house, but then didn't know the name of the street or the address where his aunt lived.

The Government relies on two cases supporting its position that the officers had probable cause to arrest Defendant Nance at the time they arrived on the scene. First, the Government cites to Chambers v. Maroney, 399 U.S. 42, 43 (1970). In Chambers, the Supreme Court found that the defendant's arrest was based on probable cause. The facts established that a service station was robbed by two armed men. Id. at 44. Immediately after the robbery, two teenagers reported to the police that they saw a blue compact station wagon speed away from the scene. Id. Further, the victim clerk of the service station reported that one of the men who robbed him was wearing a green sweater and the other robber was wearing a trench coat. Id. This description of the robbers was "broadcast over the police radio." Id. Approximately one hour after the robbery, officers stopped a light blue station wagon about two miles from the service station. Id. The defendant was one of the occupants and was wearing a green sweater. All four occupants of the vehicle were immediately arrested. Id. The Supreme Court found that the facts supported a finding of probable cause for the officer to arrest. Id. at 46-47. The Court's decision, however, turned on the officers' observation of specific and distinctive portions of the robberies a light blue compact station wagon, the defendant wearing a green sweater, and a trenchcoat found in the car from the victim clerk and the teenage observers.

The Court finds that <u>Chambers</u> is distinguishable from the current case. The Supreme Court's decision turned on the specificity of eye-witness testimony that provided the basis for probable cause. In <u>Chambers</u>, the specific description of the car, the Defendant's green sweater, and the trenchcoat found in car provided ample reason to justify a finding of probable cause. In the current case, Officer Walker testified that the automobile and the Defendant matched the general description provided by the BOLO reports. The general description of the vehicle and perpetrators in this case did not rise to the level of specificity of the eye witness accounts in <u>Chambers</u>. The BOLO reports provided enough evidence, such as general descriptions of the car and the suspects, to give reasonable suspicion, but did not provide the level of particularized characteristics to support a probable cause finding in this case. Further, no eye witness testimony from the robberies was offered at the suppression hearing, and the investigating officers did not testify about any additional evidence known to them at the time of arrest tying the Defendant to the robberies.

The Government also relies on a similar case from the Sixth Circuit. In <u>United States v. Cox</u>, police bulletins reported that two suspects of a bank robbery were black males, approximately six feet tall and 160 to 170 pounds. 464 F.2d 937, 939 (6th Cir. 1972). The police reports indicated that the getaway car was "possibly a 1966 maroon Toronado." <u>Id.</u> Two officers heard these bulletins over the radio and around one and one-half hours later, the officers observed a vehicle matching the police bulletin parked outside of a gas station seven miles away from the robbery. <u>Id.</u> The two males standing near the car matched the description of the suspects. <u>Id.</u> The car was searched and, after a pillowcase containing a large sum of money was found inside, all three occupants were arrested. <u>Id.</u> The Sixth Circuit held that "[t]he officers had probable cause to believe that the defendant had committed the crime." <u>Id.</u> The court based its holding on the officers' testimony

"that to their own observation the defendants resembled the descriptions of the alleged bank robbers that had been broadcast over the police radio." Id.

The Court finds that Cox is also distinguishable from the present case. First, the defendants in Cox were not arrested until a pillowcase containing a large sum of money was recovered from the automobile. Discovery of the money was before the defendants' arrest for bank robbery. In the case before the Court, the Defendant was arrested prior to the discovery of the gun. At the time of arrest, there was no additional evidence found by Officer Walker or the arresting officer linking the Defendant to the crimes pursuant to the lawful investigative stop. In addition, the Court concludes that reliance on Cox is unavailing to support probable cause to arrest the Defendant in the current case.[14]

In addition, Officer Walker testified that once the Defendant was stopped, he was nervous and evasive when answering questions. Specifically, Walker testified that the Defendant was unable to provide the address or the name of the street where he was purportedly heading and that he stuttered and was unsure of his answers to questions. [Tr. 16, 21, 40]. Nervousness has been deemed an "unreliable indicator, especially in the context of a traffic stop," because many citizens become nervous when stopped by the police "even when they have nothing to fear or hide." United States v. Richardson, 385 F.3d 625, 629-31 (6th Cir. 2004). Little weight is given to the nervousness of the defendant. United States v. Smith, 263 F.3d 571, 594 (6th Cir. 2001). Even considering the

---

[14]The Government, in a footnote to its supplemental brief, argues that the rationale of Cox supports another basis to find probable cause to search the Defendant's vehicle pursuant to the automobile exception. [Doc. 52 at 7-8]. In Cox, however, the Court of Appeals found there was probable cause to search the defendant's car pursuant to a lawful arrest, along with the Defendant's consent to search his vehicle. The Government does not expound upon the automobile exception as another basis supporting probable cause to search the Defendant's vehicle in this case.

Defendant's nervousness and evasive answers as part of the totality of the circumstances, they do not link him to the robberies like the pillowcase of money in <u>Cox</u>.

Based on the totality of the circumstances as reviewed above and more fully analyzed in the Court's discussion of reasonable suspicion, the Court finds that the investigatory detention did not give probable cause to believe that the Defendant had committed the armed robberies. Accordingly, the Court finds that Officer Walker and the investigating officers did not have probable cause to believe that the Defendant committed a crime, and thus, did not have grounds for effectuating an arrest. Thus, the officers could not search the car incident to the Defendant's arrest.

Before turning to the question of whether the dog alert provided probable cause to search the Defendant's car, the Court will briefly address whether the Defendant was properly handcuffed as a part of the <u>Terry</u> stop. For this determination, the Court looks to whether the intrusiveness of the stop was reasonably related to the situation by reviewing the reasonableness of the officer's actions in the context of the presenting circumstances. <u>United States v. Caruthers</u>, 458 F.3d 459, 464 (6th Cir. 2006). When the circumstances of an investigatory detention reveal that the officer's safety is at risk, the Sixth Circuit has permitted greater intrusion into the detainee's personal freedom as a part of an investigatory detention. See <u>United States v. Hardnett</u>, 804 F.2d 353, 357 (6th Cir. 1986) (holding that officers were justified in blocking defendant's car, with guns drawn, and ordering the occupants out of the car, approaching as a part of the <u>Terry</u> stop based upon a tip the occupants were armed).

Specifically, handcuffing a suspect does not "exceed the bounds of a <u>Terry</u> stop, so long as the circumstances warrant that precaution." <u>Houston v. Clark County Sheriff Deputy John Does 1-5</u>, 174 F.3d 809, 815 (6th Cir. 1999) (upholding handcuffing of suspects believed involved in a

shooting); see also United States v. Atchley, 474 F.3d 840, 849 (6th Cir. 2007) (determining that officer's handcuffing of defendant during investigatory detention was appropriate as a "safety precaution" when officers were investigating tip of methamphetamine laboratory and defendant was nervous and evasive); United States v. Heath, 259 F.3d 522, 530 (6th Cir. 2001) (approving handcuffing of the defendant at the inception of a Terry stop when the officers reasonably suspected defendant was carrying drugs and believed he might be armed due to their experience with drug traffickers); United States v. Hurst, 228 F.3d 751, 758 n.3 (6th Cir. 2000) (noting that "under the circumstances, where defendant was reasonably suspected of having just burglarized a home and might reasonably have been deemed armed and dangerous, the officers' attempt to use handcuffs as a precautionary measure to secure their safety was not unreasonable or otherwise improper."). Although each of these cases turn on their individual facts, in each of them, the officer(s) had reason to believe the person being handcuffed posed a danger to the officer.

In the present case, the Court finds that the officers on the scene were justified in handcuffing the Defendant based on a reasonable belief that he was armed and dangerous. The officers received BOLO reports on three separate armed robberies. The Defendant was driving a vehicle that matched the general description of the vehicle identified in the BOLO reports, the Defendant matched the general description of the person identified in the BOLO reports as committing three separate armed robberies, the maroon vehicle was stopped in the middle of Clinton Highway next to a white car matching the description of the car involved in the second armed robbery, the Defendant was stopped at the early morning hour of 4:00 a..m., in the general vicinity of the last reported armed robbery, and the Defendant was nervous and evasive when responding to Officer Walker's initial questions. The Court finds the police could have reasonably believed that Defendant

Nance was potentially armed and dangerous and/or that he could access a weapon if not restrained. The Court finds that all of these facts establish that the investigating officers, upon arriving at the scene, could handcuff the Defendant during questioning based on the reasonable belief that the Defendant was potentially armed and dangerous and/or that he could access a weapon if not restrained.

### C. Drug detection sniff

The Defendant contends that the canine drug detection sniff that was performed on the vehicle did not provide police with probable cause because (1) the K-9 that performed the sniff, Axel, was not reliable, and (2) the sniff was not executed properly. See [Doc. 22 at 4]; [Doc. 53 at 9-14]. The Government argues that the drug dog was reliable and the sniff of the Defendant's car was properly executed. It asserts that Axel's alert provided probable cause to search the Defendant's car pursuant to the automobile exception.

### (i) Axel's training and reliability

Police may search the entirety of an automobile and any contents located within it without a warrant when they have probable cause to believe that the automobile contains contraband. United States v. Mans, 999 F.2d 966, 969 (6th Cir.), cert. denied, 510 U.S. 999 (1993); see also California v. Acevedo, 500 U.S. 565, 580 (1991); United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir. 1998). An automobile's ready mobility is "an exigency sufficient to excuse failure to obtain a search warrant once probable cause to conduct a search is clear." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (citing California v. Carney, 471 U.S. 386, 390-391 (1985)). Further, an individual has a reduced expectation of privacy in an automobile,

owing to pervasive regulation of automobile ownership and operation.  Id.  If it is clear that a car is readily mobile and that probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more.  Id.

The Supreme Court has held that a drug dog's detection sniff of items located in a public place is not itself a "search" within the meaning of the Fourth Amendment.  United States v. Place, 462 U.S. 696, 707 (1983).  The Court of Appeals for the Sixth Circuit has clarified that "a canine sniff is not a search within the meaning of the Fourth Amendment" no matter where it occurs, as long as the canine team is "lawfully present at the location where the sniff occurs."  United States v. Reed, 141 F.3d 644, 650 (6th Cir. 1998).  Whether a canine team is lawfully present at a location depends on whether the individual whose property is to be subjected to a drug detection sniff has a reasonable expectation of privacy in that location.  See United States v. Diaz, 25 F.3d 392, 396-97 (6th Cir. 1994) (finding that drug agents using trained dogs to sniff out drugs in a motel parking lot were lawfully present on the parking lot because "the motel guests had no reasonable expectation of privacy in the [lot]").

When a warrantless search has occurred, the Government bears the burden of proving by a preponderance of the evidence that it was justified under one of the recognized exceptions to the warrant requirement.  See Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971); United States v. Oliver, 686 F.2d 356, 371 (6th Cir. 1982) (holding that "[t]he burden rests on the Government to establish that a warrantless search was conducted within the narrow confines of an established exception to the Fourth Amendment"); see also United States v. Matlock, 415 U.S. 164, 178 n.14 (1974) (observing that "[t]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.") (citing Lego v. Twomey, 404 U.S. 477, 488-489 (1972)).  In this case, the Government asserted that the search of the Defendant's

vehicle fit within the automobile exception, and therefore the Government bore the burden of proving at the suppression hearing that probable cause existed. An alert by a properly-trained drug detection dog is sufficient to establish probable cause for the presence of a controlled substance. United States v. Navarro-Camacho, 186 F.3d 701, 706 (6th Cir. 1998); see also United States v. Page, 154 F. Supp. 2d 1320, 1326 (M.D. Tenn. 2001) (characterizing this holding as well-settled). For an alert to support a determination that probable cause existed for a search, the Government must prove the training and reliability of the dog. See Diaz, 25 F.3d at 394 (holding that "[f]or a positive dog reaction to support a determination of probable cause, the training and reliability of the dog must be established"); United States v. Huerta, 247 F. Supp. 2d 902, 908 (S.D. Ohio 2002) (placing the burden of proving a drug dog's training and reliability on the Government and applying a "preponderance of the evidence" standard); United States v. Lambert, 351 F. Supp. 2d 1154, 1162 (D. Kan. 2004) (holding that in "proving probable cause to search the defendant's pickup, the Government must prove that the dog was trained and certified at the time of the alert"); United States v. Neatherlin, 66 F. Supp. 2d 1157, 1161 (D. Mont. 1999) (finding that the Government has the burden of proving a drug dog's reliability).

The Court notes that it has not located, nor have the parties cited, any Court of Appeals for the Sixth Circuit precedent that expressly places the burden of proving a drug dog's training and reliability by a preponderance of the evidence squarely on the Government. However, as the Government bears the burden of proving by a preponderance of the evidence that a warrantless search is within an exception to the warrant requirement, it logically follows that the Government should bear the same burden with respect to proving a drug dog's training and reliability, since those elements are

necessary prerequisites to a finding that probable cause stemmed from an alert. This logic, together with the cited persuasive authority provided by several district courts, leads the Court to conclude that its interpretation of <u>Diaz</u> is correct.

The Defendant presented the testimony of Steven D. Nicely, a dog trainer and police dog consultant. The Defendant argues that Mr. Nicely's expert opinion establishes that the testing and training of Axel does not support that Axel will only alert to the presence or absence of drugs. [Doc. 53 at 11]. The Government responds that Axel's positive alert established probable cause to search the Defendant's vehicle because Axel is trained, certified, and reliable. [Doc. 52 at 11].

The testimony of Deputy Myers is that a valid alert occurred at the Defendant's automobile providing probable cause for the search. Deputy Myers testified that Axel was certified, well trained, and reliable. "The primary issue in determining the credibility of a dog's alert is not the capability or ability of a dog to accurately identity particular scents, but is instead the communication between the handler and the dog based on the indisputable ability." <u>United States v. Howard</u>, 448 F. Supp. 2d. 889, 897-98 (E.D. Tenn. 2006), <u>aff'd</u>, No. 08-6143, 2010 WL 3543174 (6th Cir. Sept. 4, 2010). Thus, "[t]he fundamental determination in evaluating the training and reliability of a drug-detection dog is the credibility of the handler's testimony." <u>Id.</u> at 889-90.

Deputy Myers gave credible testimony as an experienced and trained canine handler that Axel alerted on the Defendant's vehicle. Deputy Myers testified that in early 2007, he participated in a six-week training academy with Axel at the Knox County Sherriff's Office. [Tr. at 52]. At the conclusion of the training, both Axel and Deputy Myers were certified by the Sheriff's Office and the National Narcotic Detector Dog Association ("NNDDA"). Deputy Myers testified that the NNDDA is a national certifying agency, and both Axel and Deputy Myers must be recertified once a year. Id. at 52-53. In addition, Axel and Deputy Myers receive a minimum of eight hours of

formal training each month. [Tr. at 54, 134-35]. Deputy Myers testified that Axel is approximately ninety-five percent reliable in controlled environment settings, meaning that in training settings he correctly alerts ninety-five percent of the time.

That drugs were not found in the searched vehicle does not indicate that Axel is unreliable. See Howard 448 F. Supp. 2d at 897. Axel alerts to the odor of narcotics. Given Deputy Myers' testimony about Axel's training, ability, and performance, the absence of drugs is not fatal to a finding that Axel is reliable. See United States v. Torres-Ramos, 536 F.3d 542, 554 (6th Cir. 2008) (internal quotations omitted) (even a low percentage of false positives is not necessarily fatal to a finding that a drug detection dog is properly trained and certified).

The Defendant introduced an expert witness, Mr. Nicely, attacking Axel's training and reliability. Mr. Nicely testified as to his opinions regarding the unreliability of Axel to alert to narcotics. The Sixth Circuit has rejected similar efforts, based on expert opinion, to discredit the methods of a drug detection dog's reliability. In United States v. Torres-Ramos, the defendant, during a suppression hearing, offered testimony of an "expert in animal behavior." 536 F.3d at 554. The defense expert testified regarding the deficiencies of the drug detection dog's training and reliability. Id. The Court of Appeals rejected the defendant's expert, making findings that the dog was reliable, and held that "[w]hile the defendant'[s] expert witness may have developed a more accurate training protocol, the law does not endorse his prescriptions." Id. In addition, the appellate court refused to overturn the district court's findings that the dogs used were trained, certified, and reliable "on the basis of mere suggestions that the training of drug detection dogs could be refined in various ways to improve the reliability of positive alerts." United States v. Robinson, 390 F.3d 853, 874-75 (6th Cir. 2004). Recently, in United States v. Howard, the Court of Appeals found that,

> A dog's training and reliability is established for purposes of admitting the dog's alert where the evidence presented, whether testimony from the dog trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog. Beyond that, any other evidence, including the testimony of other experts, that may detract from the reliability of the dog's performance properly goes to the credibility of the dog – that is, the *weight* to be given the dog's alert.

Howard, -- F.3d --- , No. 08-6143, 2010 WL 3543174, *9 (Sept. 4, 2010) (internal quotations and citations omitted).

Thus, this Court rejects the opinion of Mr. Nicely in determining the reliability and certification of Axel as a drug detection dog.

The use of a trained and certified drug-detection dog is an accepted investigative technique in the Sixth Circuit. Diaz, 25 F.3d at 394-95. This Court credits the testimony of Deputy Myers and sufficient evidence exists that Axel is well-trained, certified, and reliable for purposes of establishing probable cause for the search.

### (ii) Canine sniff procedure

The Defendant challenges the procedures employed by Deputy Myers and Axel in two respects: (1) the dog's alert and (2) the propriety of the dog's entry into the car. First, the Defendant argues the drug detection dog "did not alert." [Doc. 53 at 9]. Defendant bases his argument on the expert testimony of Mr. Nicely that Axel's actions were "not consistent with a dog acting in the presence of a target." [Doc. 53 at 10-11]. The Government maintains that "evidence established that a positive alert in fact occurred." [Doc. 52 at 9].

As discussed above, the use of trained drug detection dogs is an accepted investigative technique in the Sixth Circuit. Diaz, 25 F.3d at 394-95. Accordingly, when a trained narcotics dog

"alerts" to an item, this factor alone constitutes probable cause. See Place, 462 U.S. at 707 (1983); United States v. Reed, 141 F.3d 644, 649 (6th Cir. 1998).

The fundamental elements of canine detection are communications by the dog of the detection of a targeted scent and the recognition by the dog's handler that the scent has been detected. Howard, 448 F. Supp. 2d at 899. This is what is commonly referred to as an "alert." For a dog's alert to be admitted on the issue of probable cause, all that is required is evidence the dog is generally certified as a drug detection dog." Id. at 895. Dogs alert in different ways, thus training plays the essential role in the communication of the alert between the dog and the handler. Id. at 898. The Court of Appeals held,

> [t]he primary issue in determining the credibility of a dog's alert is not the capability or ability of a dog to accurately identify particular scents, but is instead the communication between the handler and the dog based on that indisputable ability. This determination in turn rests almost entirely on the credibility of the dog's handler's testimony because the handler is the only witness who can speak to the subjective interaction during a particular dog alert.

Howard, -- F.3d --- , No. 08-6143, 2010 WL 3543174, *11 (Sept. 4, 2010) (internal quotations and citations omitted).

Accordingly, "training a dog is a relatively simple task," but "training a handler to correctly recognize how a dog responds to targeted narcotics typically requires more time and effort." Howard, 448 F. Supp. 2d at 899-90 (citations omitted). As such, handlers and dogs are paired at the beginning of a training program and continue to work together for the dog's years of service. Id. When a dog is "sniffing," the handler "must interpret the dog's actions correctly." Id. at 899. The Court has already found that Deputy Myers and Axel are well-trained and that Axel is reliable. Deputy Myers testified that Axel's act of scratching on the center console of the car was an alert.

The Court finds Deputy Myers' testimony that Axel alerted to be credible. See Howard, 448 F. Supp. 2d at 900.

In this case, Defendant's expert witness, Mr. Nicely, testified that Axel's behavior was "not consistent with a dog acting in the presence of a target." [Doc. 53 at 10-11]. Mr. Nicely testified that while he had not met Axel and was unfamiliar with his behaviors, "all positive alerts … are the same." [Tr. at 188-89]. In addition, Mr. Nicely opined that the police video established the absence of a proper alert, stating "you wouldn't have been able to see his feet, but you would have at least seen his tail, him up on the seat . . . [y]ou would have at least seen his tail wagging." [Tr. at 198].

The Government rejected Mr. Nicely's testimony and pointed to Deputy Myers' testimony to establish that Axel alerted on the Defendant's vehicle. Deputy Meyers' testified that he was completely familiar with Axel's behaviors and that Axel is trained to aggressively seek the source of the odor. In addition, Deputy Myers testified that when Axel alerts to the source of the odor he "will have a final response which is an aggressive response which could be scratching, biting, or barking." [Tr. at 55]. The Court of Appeals, in Howard, recently found that,

> A dog's training and reliability is established for purposes of admitting the dog's alert where the evidence presented, whether testimony from the dog trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog. Beyond that, any other evidence, including the testimony of other experts, that may detract from the reliability of the dog's performance properly goes to the credibility of the dog – that is, the *weight* to be given the dog's alert.

No. 08-6143, 2010 WL 3543174, *9 (internal quotations and citations omitted). As the dog's handler, Deputy Myers possesses an intimate knowledge of Axel, which allows him to recognize changes in the dog's behavior when it may be impossible for a lay person to do so. In addition, Deputy Myers observed Axel's alert first as his handler. Deputy Myers' credible testimony, as an experienced and trained canine handler, was that Axel alerted on the Defendant's vehicle. The Court

rejects the Defendant's argument that the dog did not alert.

Second, the Defendant argues that when Axel "actually entered the vehicle," a violation of the Fourth Amendment occurred. [Doc. 53 at 14]. The Government contends that there is "no violation of the Fourth Amendment due to Axel's entry into the open car door" on the dog's own volition. [Doc. 52 at 11]. Whether a drug dog can lawfully enter a vehicle is an open question in the Sixth Circuit. The Tenth Circuit is the only Court of Appeals that has ruled upon this issue. United States v. Winningham, 140 F.3d 1328 (10th Cir. 1998); United States v. Stone, 866 F.2d 359 (10th Cir. 1989).

In addressing the issue of whether a non-consensual dog sniff occurring inside the vehicle constitutes a search under the Fourth Amendment, the Tenth Circuit focused on the volitional nature of the dog's behavior. Stone, 866 F.2d 359 at 360. In Stone, the drug detection dog jumped through a car's hatchback, which was left open by the defendant, and sniffed the car's interior. During the course of a traffic stop, an officer asked the driver of the vehicle to show him a traffic citation received by the driver earlier in the day. Id. Shortly thereafter, another officer arrived with a drug detection dog. Id. The dog proceeded with his handler to circle the car, and ultimately the dog jumped through the open hatchback and alerted to a duffel bag. Id. The Tenth Circuit held that the dog's "instinctive actions" did not violate the Fourth Amendment because the police did not ask the defendant to open the hatchback to allow the dog to jump inside. Id. at 364. Additionally, the Court found that the police handler did not encourage the dog to jump inside the vehicle. Id. Rather, the police handler testified that "I just let his leash go and let him go where his nose would take him." Id.

In contrast, in United States v. Winningham, 140 F.3d 1328 (10th Cir. 1998), the officer opened the door of the vehicle, while allowing the vehicle to sit on the side of the road for at least

six minutes before the drug dog could arrive.  Moreover, the dog handler also unleashed the dog as it neared the open door.  Id. at 1330.  The court held that the dog sniff was a search because the officers acted with a "desire to facilitate a dog sniff of the van's interior."  Id. at 1331.

This Court finds the analysis set forth by the Tenth Circuit in both Stone and Winningham to be persuasive.  Following the rational of Stone in this case, there is no evidence that Officer Walker asked the Defendant to open the automobile door "so the dog could jump in."  Stone, 866 F.2d at 364.  In this case, the Defendant left the door of his car open as he was exiting the car.  The facts of this case are  distinguishable from Winningham in which the police officers deliberately opened the car door and waited for approximately six minutes for the drug dog to arrive causing the Tenth Circuit to find a Fourth Amendment violation.

In addition, there is evidence in this case that the dog's actions were instinctual, which also follows the Stone court's rationale for upholding a dog sniff.  In Stone, the Tenth Circuit focused on whether the dog's handler encouraged the dog to jump into the car.  866 F.2d at 364.  The court found the handler did not encourage the drug dog to jump in the car, based on the fact that the dog remained on his leash throughout the sniff.  On the other hand, in Winningham, the court emphasized that the drug detection dog was unleashed throughout the sniff.  Winningham, 140 F.3d at 1330.  In this case, Deputy Myers did not instruct Axel to jump into the vehicle, rather, the dog jumped in on his own accord due to his training to seek the odor of narcotics aggressively.  [Tr. at 62].  Axel also remained on his leash throughout the sniff.

This Court finds that Axel properly alerted, and that his position inside the vehicle at the time of the alert does not result in a violation of the Fourth Amendment.  Axel's alert gave the officers probable cause to search the vehicle.   Thus, the Court finds the officers, who already had suspicions concerning the Defendant's involvement in criminal activity, had probable cause for the warrantless

search of Defendant's automobile, including the passenger compartment where the gun was located.[15]   This Court also finds the alert by Axel formed a sufficient basis for probable cause and the subsequent search was not illegal.

### D.    Protective Sweep of the Buick

Alternatively, the Government contends that because Trooper Walker reasonably believed that the occupant of the vehicle was armed and dangerous, the officers were allowed to perform a limited search of the vehicle pursuant to <u>Michigan v. Long</u>, 463 U.S. 1032 (1983). The Government further argues that the Defendant's placement in handcuffs and removal from the vehicle does not impact whether the officers may search the car at the time of the protective sweep.   Although the Court has already found that the officers had probable cause to search the Defendant's car from the drug dog's alert, it will briefly address the propriety of a protective sweep of the car in the event that the District Court determines that the dog sniff did not provide probable cause.

As discussed above, when a law enforcement officer has a reasonable suspicion, based on articulable facts, that criminal activity has occurred or is occurring, he may stop and briefly detain a person for investigative purposes.  <u>Terry</u>, 392 U.S. at 15 (1968).  Similarly, if a law

_____

[15]The Defendant also argues that an officer placing her head inside the passenger compartment of the car before the dog sniff resulted in an illegal search of the vehicle.  [Doc. 22 at 4].  The Defendant, however, fails to identify any evidence that resulted from the search.  The Court finds that this action by the officer was a search of a vehicle in violation of the Fourth Amendment.  <u>United States v. Manning</u>, No. 1:06-00010, 2007 WL 1656223, * 8 (M.D. Tenn. June 7, 2007) (holding that officer had "no right to simply open doors and search inside).  The violation, however, did not result in the discovery of evidence.  Accordingly, the Court's analysis addresses only whether the canine alert provided the officers probable cause to search the Defendant's automobile.

enforcement officer has a reasonable and articulable suspicion that an occupant of a vehicle has been involved in criminal activity, the officer may stop that vehicle for investigative purposes. Dunaway v. New York, 442 U.S. 200, 207. Once the car is stopped, officers can do a protective sweep of the passenger compartment if they have a "reasonable belief based on specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous . . ." Michigan v. Long, 463 U.S. at 1049 (1983).

Up until a year ago, there would have been no question that an officers' search of the passenger compartment of the vehicle was lawful because it was a precautionary search for weapons. In this case, the officers on the scene knew a gun was involved in the robberies and it was reasonable to believe the gun was inside the Defendant's car. However, the Supreme Court's decision in Arizona v. Gant, 129 S.Ct. 1710, 1721 (2009), has made even a protective sweep following a Terry stop under these circumstances at least debatable.

In Gant, the Supreme Court held that the police may search a vehicle incident to the recent occupant's arrest "only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." Id. at 1723. Here, the Defendant was handcuffed and removed from the vehicle at the time the vehicle was searched, and he was not in "reaching distance" of any part of his car. The Gant Court, however, stated that it was not overruling its previous holdings which "established exceptions to the warrant requirement [that authorize] a vehicle search under additional circumstances when safety or evidentiary concerns demand." Id. at 1721.

It is well-settled that the Terry-stop rationale extends to vehicle searches:

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain control of the weapons.

Long, 465 U.S. at 1049. Under prior case law, the fact that the Defendant was handcuffed and incapable of reaching a firearm within his car would have been irrelevant. See United States v. Wynn, 148 F.Appx. 471 (6th Cir. 2005). The Court of Appeals, after discussing the Terry factors that support an investigatory search of a vehicle, found that the fact that the occupants were out of the vehicle and in the process of being arrested did not vitiate the officer's right to make a protective search of the truck for weapons. Id. at 476.

Just as with a search of a car incident to the driver's arrest, the interest of police safety is no longer a basis for a protective sweep once the driver is detained in handcuffs. See Gant, 129 S.Ct. at 1716 (holding that if no possibility that the arrested person could reach into the car exists, the justification of protecting officers is absent). After Gant, this Court finds that the officers could not perform a protective sweep of the Defendant's car, although they reasonably believed the Defendant to be armed and dangerous, because he was handcuffed and removed from the car. The Supreme Court's reasoning in Gant applies equally to a protective sweep of the Defendant's car for officer safety. Accordingly, a protective sweep does not provide an alternative basis for the officers' entry into the Defendant's car.

### E.     Search of the vehicles located at 1605 Wallace Street

The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible. Mapp v. Ohio, 367 U.S. 643, 654 (1961); United

States v. Dice, 200 F.3d 978, 983 (6th Cir. 2000).  However, the Supreme Court has stated that "as with any remedial device the application of the [exclusionary] rule has been restricted to those areas where its remedial objective are thought most efficaciously served."  Segura v. United States, 468 U.S. 796, 804 (1984) (internal quotations omitted).  Recently, the Supreme Court reaffirmed this limiting principle in Herring v. United States, — U.S. —, 129 S. Ct. 695 (2009).  The Supreme Court stated in Herring that "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  129 S. Ct. at 702.  The Supreme Court concluded that the exclusionary rule should operate only "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systematic negligence."  Id.

When the exclusionary rule operates to suppress evidence, [t]he scope of evidence to be excluded sweeps broadly, including both '[e]vidence obtained as a direct result of an unconstitutional search and seizure,' as well as evidence that is considered the 'fruit of a prior illegality' that was 'come at by exploitation of [the initial] illegality.'"  Dice, 200 F.3d 978, 983 (quoting Segura, 468 U.S. 706, 804 (1984); see Nardone v. United States, 308 U.S. 338, 341 (1939) (first employing the now ubiquitous phrase "fruit of the poisonous tree" to describe evidence derived from an unlawful search and seizure); Murray v. United States, 487 U.S. 533, 536-37 (1988) (stating that the fruit of the poisonous tree doctrine "bars evidence which, though not obtained in [an] illegal search, was derived from information or items in the search).  The Supreme Court has stopped short of establishing a bright line rule that "evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police.  Wong Sun v. United States, 371, U.S. 471, 488 (1964); Hudson v. Michigan, 547 U.S. 586, 592 (2006) (reasoning that "but-for

causality is only a necessary, not sufficient, condition for suppression"); Segura, 468 U.S. at 815 (stating that the Supreme Court has "never held that evidence is 'fruit of the poisonous tree' simply because 'it would not have come to light but for the illegal actions of the police'"). In other words, "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." Hudson, 547 U.S. at 592, 126 S.Ct. 2159. Instead, evidence is considered fruit of the poisonous tree that must be suppressed only when it was "come at by exploitation of the primary illegality" committed by the police. Wong Sun, 371 U.S. at 488.

As a factual matter, testimony at the hearing did not establish when or how the police learned of the 1605 Wallace Street address. The Defendant asks this Court to assume that the Defendant himself told police the address after he was arrested. [Doc. 53 at 6]. The Defendant alleges that the address on his driver's license is not 1605 Wallace Street. [Id.]. The Defendant has not proven this allegation. At the suppression hearing, the Defendant did not introduce his driver's license as an exhibit and no testimony was offered as to what address the license identified. Based on the absence of evidence offered at the suppression hearing, the Court is unable to determine how the police obtained the 1605 Wallace Street address. Even if the Court assumes the Defendant told police the address, it is unclear whether it was before or after he was handcuffed. The Defendant argues that we can hear his conversation on the video up until he is handcuffed and points to the fact that he never mentions the address. [Doc. 53 at 6]. The Court previously found that the Defendant was handcuffed pursuant to an investigatory stop based on the officers' belief that he was armed and dangerous. The Court, as a factual matter, must reject the Defendant's argument because there is no proof that the address of 1605 Wallace Street was obtained by the police as a result of his arrest. Thus, even if the Defendant had been unconstitutionally seized, the evidence subsequently gained from the vehicles located at 1605 Wallace Street was not fruit of the poisonous tree. Moreover, the

Court previously found that the Defendant was not unreasonably seized in violation of the Fourth Amendment.

## IV.    CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Defendant's Motion to Suppress Evidence **[Doc. 21]** be **DENIED.**[16]

Respectfully submitted,

_____s/ H. Bruce Guyton_____
United States Magistrate Judge

---

[16]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).